UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| HOUSTON HARPER, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 2:17-cv-00228-JMS-DLP |
| CORIZON HEALTH INC., *et al.* | ) ) ) | |
| Defendants. | ) ) | |

**Order Granting Defendants' Motion for Summary Judgment and
Directing Entry of Final Judgment**

Plaintiff Houston Harper, an Indiana prisoner, brought this civil rights action pursuant to 42 U.S.C. § 1983 against defendant Nurse Susan Leturgez for failing to properly treat his dislocated shoulder. He also asserts that Corizon Health, Inc. has a widespread custom, practice, and policy of not meeting the emergency medical needs of inmates at Wabash Valley Correctional Facility (WVCF). Dkt. 1. The Court screened the complaint and permitted Mr. Harper's Eighth Amendment deliberate indifference claim and state law emotional distress claim to proceed against both defendants, and his state law breach of contract claim to proceed against defendant Corizon. Presently pending before the Court is the defendants' motion for summary judgment. For the reasons explained below, the motion for summary judgment, dkt. [34], is **granted**.

### I. Summary Judgment Legal Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas*

*v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Local Rule 56-1(e) requires that facts asserted in a brief must be supported "with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." *Id.* In addition, the Court will assume that the facts as claimed and supported by admissible evidence by the movant are admitted without controversy unless "the non-movant specifically controverts the facts in that party's 'Statement of Material

Facts in Dispute' with admissible evidence" or "it is shown that the movant's facts are not supported by admissible evidence." Local Rule 56-1(f). The Court "has no duty to search or consider any part of the record not specifically cited in the manner described in subdivision (e)." Local Rule 56-1(h); *see Kaszuk v. Bakery and Confectionery Union and Indus. Intner. Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986) ("The court has no obligation to comb the record for evidence contradicting the movant's affidavits."); *Carson v. E.On Climate & Renewables, N.A.*, 154 F. Supp.3d 763, 764 (S.D. Ind. 2015) ("The Court gives Carson the benefit of the doubt regarding any disputed facts, however, it will not comb the record to identify facts that might support his assertions.").

## II.     Factual Background

The following statement of facts was evaluated pursuant to the standard set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Harper as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

### A.     Mr. Harper's Complaint

In his complaint, Mr. Harper alleged that when he dislocated his shoulder on October 1, 2016, Nurse Leturgez refused to see him or provide him with pain medication because she was too busy with other tasks. He alleged that he put his own shoulder back into its socket, but that it separated again later that night. Mr. Harper states that he was taken back to the infirmary, seen by a doctor, and given ice, a shot of something, and some Tylenol. His shoulder causes him moderate to extreme pain to this day, he alleges, and Corizon has not provided him proper pain medication or an x-ray to treat the condition. *See* dkt. 1.

**B.	October 1, 2016, Shoulder Injury**

Mr. Harper's medical records reflect that he injured his right shoulder while playing basketball on October 1, 2016.[1] Dkt. 35-1 at 4; Dkt. 35-2 at 13-18. Although the medical records reflect that Nurse Leturgez briefly saw Mr. Harper in the waiting area of the clinic, Mr. Harper asserts that Nurse Leturgez never talked to him or examined him. Rather, according to Mr. Harper, Lt. Ewers spoke to Nurse Leturgez in the back of the infirmary, but Nurse Leturgez stated that she was too busy doing other things, such as handing out medication to other inmates, and refused to give Mr. Harper any pain medication in the meantime. Dkt. 1 at 5, Dkt. 51-1 at 1-2. Mr. Harper's version of the events is supported by a declaration by Stacey Huddleston, another inmate at WVCF. Dkt. 51-1 at 3-4.

After Mr. Harper had waited for about an hour, the custody officers who accompanied Mr. Harper into the clinic witnessed Mr. Harper (who had experienced a dislocated shoulder at least once in the past) place his right shoulder back into proper alignment. He then informed the custody officers that he did not want to wait for any medical treatment in the clinic and requested to be returned to his cell. Dkt. 1 at 5-6; Dkt. 35-3 at 2.

Later that night, around 5am, Mr. Harper asserts that his shoulder became dislocated again. However, Dr. Ippel asserts that it would be highly unusual for a shoulder to dislocate during sleep as a substantial amount of force is required to dislocate the shoulder joint and it is difficult to imagine how the shoulder could dislocate without discrete trauma. Dkt. 35-1 at 6, n.2. Taking the

---

[1] Mr. Harper's medical records show that he experienced two other basketball-related injuries earlier in 2016. On February 18, 2016, Mr. Harper injured his right hand during a basketball game, but refused treatment at an outside medical facility. Dkt. 35-2 at 32-38. On July 7, 2016, Mr. Harper dislocated his left shoulder while playing basketball. *Id.* at 39-43. During the doctor's examination, while Mr. Harper was rotating his arm, his shoulder relocated into the socket. Although Mr. Harper stated he had no further pain, he was transported to the Terre Haute Regional Hospital ER and his shoulder was x-rayed.

4

evidence in the light reasonably most favorable to Mr. Harper, the Court will assume that Mr. Harper's shoulder became dislocated again around 5am.

Mr. Harper was seen the next day, October 2, 2016, at around 5:39 am, by medical staff. Dkt. 1 at 6; dkt. 35-1 at 6; dkt. 35-2 at 7-12. Although he reported pain in his shoulder, there is no indication (and Mr. Harper does not claim) that the shoulder was dislocated at the time he was examined by medical staff in the facility clinic on October 2, 2016. His physical examination reflected no swelling or discoloration of the shoulder area. Mr. Harper reported no numbness or tingling, but stated he was experiencing pain in his shoulder with movement. Mr. Harper was given ice compresses, a Ketorolac (Toradol) injection (a strong, short-term analgesic used to relieve moderate to severe pain) and acetaminophen to take as needed. He was also given an ace wrap and sling to immobilize the right arm and shoulder. The medical records reflect that no x-ray of the shoulder was prescribed. However, Mr. Harper asserts that an x-ray was ordered for his shoulder. Dkt. 1 at 6.

On January 6, 2017, Mr. Harper was seen by Dr. Mary Ann Chavez in response to his health care request form that he was continuing to experience left shoulder pain and he believed an x-ray of his shoulder had been prescribed after his October 1, 2016, shoulder dislocation. Dkt. 35-2 at 5-6, 25. Dr. Chavez had previously treated Mr. Harper's dislocated left shoulder on July 7, 2016. Dkt. 35-2 at 42-43. During her physical examination on January 6, 2017, Dr. Chavez informed Mr. Harper that no x-ray had been prescribed. She further noted that Mr. Harper was continuing with his previously prescribed home exercise program (HEP) to increase strength and flexibility in his left shoulder. She observed that Mr. Harper was able to touch the top and back of his head. He had full range of motion and his strength in his left arm was almost equal to that in his right arm. The only pain he noted was minimal pain along border of his left latissimus dorsi

5

(large muscle in back). Dr. Chavez encouraged Mr. Harper to continue with his shoulder strengthening and flexibility exercises. Based on her physical examination of Mr. Harper, no x-ray, prescription level pain medication, or further treatment was prescribed by Dr. Chavez. *Id.*

On February 13, 2017, Mr. Harper again submitted a request for health care stating that he had not received a shoulder x-ray which he believed had been prescribed. Dkt. 35-2 at 4, 24. He did not identify which shoulder he believed should be x-rayed. He was informed by nursing staff that, based on his recent physical examination and reported symptoms, no x-ray had been ordered. He was encouraged to continue with his home exercise program and take over- the-counter pain medication as needed. *Id.*

On May 11, 2017, Mr. Harper submitted a request for health care stating that he was having pain in his shoulder, but again failed to specify which shoulder was in pain. Dkt. 35-2 at 23. During his visit with the nurse, Mr. Harper requested an x-ray for his shoulder, so x-ray for both shoulders was ordered. *Id.* at 3, 23. Mr. Harper received the x-ray of both shoulders on May 13, 2017. Dkt. 35-2 at 21. No different or additional treatment was recommended by his medical providers after Mr. Harper received his requested x-ray and he has filed no further requests for health care regarding shoulder pain for either shoulder. Dkt. 35-1 at 8.

The results of Mr. Harper's May 13, 2017, x-ray were similar to his earlier July 7, 2016, x-ray, dkt. 35-1 at 20. There was no acute fracture or dislocation in either of his shoulders. The chronic conditions noted in both the right and left shoulder x-rays are typical for an active man in his mid-fifties and do not indicate, without further physical limitations, the need for surgery, prescription level pain medication, or any other treatment besides the over-the-counter pain medication and strengthening exercises that had been recommended by his medical providers. Dkt. 35-1 at 8.

C.  **Shoulder Dislocations**

Dr. Ippel, a physician employed first by Corizon, LLC, and later by Wexford of Indiana at the New Castle Correctional Facility, submitted an affidavit based on his review of Mr. Harper's medical records. Dr. Ippel's affidavit regarding shoulder dislocations is consistent with reputable literature. Dr. Ippel opined that it is not certain what type of shoulder dislocation was experienced by Mr. Harper on October 1, 2016, because he reduced the dislocated shoulder himself ("self-reduction") and left the clinic before he could be examined by medical staff. Dkt. 35-1 at 4. However, Dr. Ippel believes that as anterior dislocations account for as many as 95% of shoulder dislocations, Mr. Harper's October 1, 2016, injury was most likely an anterior shoulder dislocation. *Id.*; *see also* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5058950/. Treatment of an anteriorly dislocated shoulder involves placing the dislocated shoulder back into alignment. Severe pain stops almost immediately once the shoulder joint is back in place. With multiple shoulder dislocations, there is recurrent shoulder instability and greater likelihood of future dislocations. *See* https://orthoinfo.aaos.org/en/diseases--conditions/dislocated-shoulder/. Self-reduction for an anteriorly dislocated shoulder has a high success rate and generally provides immediate pain relief once the dislocated shoulder is reduced. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5882288/.

Although a shoulder dislocation can certainly be painful, unless the dislocation results from a severe traumatic event causing additional injury, it does not generally require the immediate triage that a life-threatening condition would require. As Dr. Ippel opines, in the prison setting, as in the outside world, there may be some component of waiting when an injury or condition is painful but does not rise to the level of an acute injury or illness that poses an immediate risk to a person's life or long-term health. Dkt. 35-2 at 5.

### III. Discussion

The defendants move for summary judgment on Mr. Harper's claims, asserting that Nurse Leturgez was not deliberately indifferent to his serious medical needs and did not intentionally inflict emotional distress, and Corizon did not have a custom or policy of deliberate indifference, did not intentionally inflict emotional distress, and did not breach its contract with the Indiana Department of Correction (IDOC). Dkt. 35. Mr. Harper argues that summary judgment is inappropriate because he contends that he suffered from an "emergent" medical care need that required immediate attention, but Nurse Leturgez failed to see him and he failed to receive an x-ray for months. Dkt. 51. In reply, the defendants argue that Mr. Harper has failed to create genuine issues of material fact. Dkt. 52.

#### A. Deliberate Indifference Claim against Nurse Leturgez

At all times relevant to Mr. Harper's claims, he was a convicted inmate. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel.*

*Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). A successful § 1983 plaintiff must also establish not only that a state actor violated his constitutional rights, but that the violation caused the plaintiff injury or damages. *Roe v. Elyea*, 631 F.3d 843, 846 (7th Cir. 2011) (citation omitted).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, 'the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.''" *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "Under the Eighth Amendment, [a plaintiff] is not entitled to demand specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him]." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted).

The defendants do not dispute that Mr. Harper's dislocated shoulder injury constituted an objectively serious medical need. Dkt. 35 at 13. Rather, they dispute whether Nurse Leturgez was deliberately indifferent.

Mr. Harper argues that Nurse Leturgez failed to provide him with immediate emergency care on October 1, 2016, for over an hour while he waited with a dislocated shoulder. He states

9

that he had to take "matters into his own hands" and alleviated his pain and suffering by popping his own shoulder back into place. Dkt. 51 at 7-8. He thereafter asked to leave the clinic.

However, viewing the evidence in the light most favorable to Mr. Harper, Nurse Leturgez had told him, indirectly through Lt. Ewers, that she was busy with other matters, such as handing out medication to other inmates. Nurse Leturgez used her reasoned medical judgment to determine that Mr. Harper's dislocated shoulder was not so urgent of a medical problem as to require her to interrupt her treatment of other patients to immediately treat him. Dkt. 35-1 at 3. Mr. Harper later fixed his own problem by popping his shoulder back and left the clinic, thus refusing further treatment that day. Mr. Harper does not allege that he requested any care or medication before he left the clinic that day.

Here, although Mr. Harper suffered from a serious medical need, a dislocated shoulder, he fails to show that he was at substantial risk of serious harm where he waited an hour and was able to fix his own dislocated shoulder. Nor has he shown that his condition worsened because of the delay. *See Williams v. Liefer,* 491 F.3d 710, 715 (7th Cir. 2007) (stating that plaintiff must "offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm"). He also fails to show that Nurse Leturgez was specifically aware that Mr. Harper was at serious risk of being harmed.

Failure to address complaints of pain can certainly lead to a claim of deliberate indifference but "this is not to say, however, that every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim," *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997). Having to wait for a period of time at a clinic for a dislocated shoulder is the sort of discomfort that one regularly suffers, whether in prison or not. *See Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009) ("An unincarcerated individual [who hurt his

shoulder] may well consider oneself fortunate if he receives medical attention at a standard emergency room within that short of a period of time [of at most two and half hours].").

Moreover, Nurse Leturgez is entitled to deference in her decision that Mr. Harper did not need to be immediately seen. *Pyles*, 771 F.3d at 409. Although Mr. Harper was unhappy with the hour long wait he had to endure, Mr. Harper "is not entitled to demand specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him]." *Forbes*, 112 F.3d at 267. Accordingly, Nurse Leturgez is entitled to summary judgment on Mr. Harper's Eighth Amendment claim against her.

B. **Deliberate Indifference Claim against Corizon**

Corizon is "treated the same as a municipality for liability purposes under § 1983." *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (holding that a corporation that contracted with a jail to provide health services is "treated the same as municipalities for liability purposes in a § 1983 action"); *Fromer v. Corizon, Inc.*, 54 F. Supp. 3d 1012, 1027 (S.D. Ind. 2014). "'It is well-established that there is no *respondeat superior* liability under § 1983.'" *Fromer*, 54 F. Supp. 3d at 1028 (quoting *Jackson v. Illinois Medi–Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002)) . "A 'private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Id.* Thus, to maintain his § 1983 action against Corizon, Mr. Harper "must demonstrate that a constitutional deprivation occurred as a result of an express policy or custom" of Corizon. *See id.* (quotation omitted). Mr. Harper is required to show that a Corizon policy was the "direct cause" of or "moving force" behind his constitutional injury. *Pyles*, 771 F.3d at 409-10. To do so, he must introduce evidence that establishes a plausible inference that Corizon "maintain[ed] a policy that sanction[ed] the maintenance of prison conditions that infring[ed] upon

the constitutional rights of the prisoners." *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 (7th Cir. 2004).

"If a plaintiff cannot identify any formal policy that is unconstitutional, the plaintiff may show deliberate indifference through a 'series of bad acts' creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Fromer*, 54 F. Supp. 3d at 1028. A plaintiff cannot rely on the circumstances surrounding his own medical treatment to establish the existence of a policy or practice. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) (holding that "a showing of isolated incidents does not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature").

As noted, Mr. Harper's claim against Corizon is that Corizon had a policy or practice of providing inadequate medical care, delaying giving pain medications, and improperly training its employees. In support, Mr. Harper has submitted an affidavit from inmate Robert L. Holleman regarding his own care and the care of inmates Joe Williams, Michael Mason, Michael Aikens, and David Howard. Dkt. 51-1 at 9-12. Mr. Holleman states he was denied care for his kidney stone in October 2014 while incarcerated at Pendleton Correctional Facility. *Id.* at 9. Mr. Holleman further testifies that: (1) Michael Aikens died after being allegedly denied prompt, adequate medical care at Pendleton Correctional Facility, (2) David Howard died from a bleeding ulcer after he was throwing up feces, and was allegedly denied prompt, adequate medical care at Pendleton Correctional *Facility,* (3) Joe Williams suffered a torn anterior collateral ligament in 2017 at Wabash Valley and was denied emergency medical care, and (4) Michael Mason suffered from a bleeding ulcer in July 2015, and was denied prompt, adequate medical care. Corizon argues that the provided testimony relates to situations that are "quite different." Dkt. 52 at 4. Mr. Harper

was not told to submit a request for health care in response to his health concern nor was he denied medical care. Mr. Harper was simply to wait for his turn. *Id.*

Mr. Harper "must demonstrate that a constitutional deprivation occurred as a result of an express policy or custom" of Corizon. *Fromer*, 54 F. Supp. 3d at 1027. As explained above, Mr. Harper has failed to show any constitutional deprivation from his having to wait his turn for Nurse Leturgez to treat his dislocated shoulder. Although Mr. Harper has provided affidavits from other inmates in order to establish that Corizon had a custom of refusing treatment at various correctional institutions, those cases are inapposite. Mr. Harper was not denied treatment. He was asked to wait, and when he became impatient, he popped his own shoulder back in and left the clinic. He was the one who refused further treatment on October 1, 2016.

Because Mr. Harper has failed to establish a pattern of deficiency was responsible for his constitutional deprivation, summary judgment for Corizon is granted.

### C. State Law Claims

Because the Court has dismissed Mr. Harper's deliberate indifference claims, the Court must decide whether it should exercise supplemental jurisdiction over his state law claims of intentional infliction of emotional distress against both defendants and the breach of contract claim against Corizon.

The Court has discretion whether to exercise supplemental jurisdiction over a plaintiff's state-law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy,

convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The Seventh Circuit has made clear that "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see Sharp Electronics v. Metropolitan Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (citation and quotation marks omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (quoting *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994)) (internal quotation marks omitted). "If it is absolutely clear that the pendent claims can be decided in only one way, the district judge can and should decide [them], to save the time of the state court." *Bowman v. Franklin*, 980 F.2d 1104, 1109 (7th Cir. 1992) (quoting *Martin-Trigona v. Champion Federal Sav. & Loan Ass'n*, 892 F.2d 575, 578 (7th Cir. 1989)). As explained below, because it is absolutely clear how the pendent state law claims can be decided, the Court will rule on the merits of the state supplemental claims.

### 1. <u>Intentional Infliction of Emotional Distress Claim against Nurse Leturgez</u>

The tort of intentional infliction of emotional distress has four elements a plaintiff must prove: (1) the defendant must engage in extreme and outrageous conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another. *Doe v. Methodist Hosp.*, 690 N.E.2d

681, 691 (Ind. 1997) (citing restatement (Second) of Torts § 46 (1965))). Liability for intentional infliction of emotional distress is found only if there is extreme and outrageous conduct. *Gable v. Curtis*, 673 N.E.2d 805, 809-10 (Ind. Ct. App. 1996). The intent to emotionally harm constitutes the basis of the tort. *Bradley v. Hall*, 720 N.E.2d 7474, 752 (Ind. Ct. App. 1999).

Although Mr. Harper is unhappy that he had to wait at least an hour for Nurse Leturgez to see his dislocated shoulder, he fails to show that Nurse Leturgez engaged in extreme or outrageous conduct. The evidence does not reflect that Nurse Leturgez outright ignored Mr. Harper, but merely that he had to wait a bit. The evidence shows that Nurse Leturgez was busy with other inmates and determined that Mr. Harper's shoulder was not an emergency. Nurse Leturgez is entitled to deference in her decision that Mr. Harper did not need to be immediately seen. *Pyles*, 771 F.3d at 409. Moreover, waiting an hour for a nurse when one suffers a dislocated shoulder does not rise to an "extreme" or "outrageous" circumstance[2]. Thus, Nurse Leturgez is entitled to summary judgment on Mr. Harper's intentional infliction of emotional distress claim against her.

2. <u>Intentional Infliction of Emotional Distress Claim against Corizon</u>

As explained above with Nurse Leturgez, Mr. Harper has failed to show that Nurse Leturgez engaged in extreme or outrageous conduct by having him wait an hour or so to be seen for his dislocated shoulder. Moreover, there is no evidence that any other Corizon employee engaged in extreme or outrageous conduct to inflict emotional distress on Mr. Harper. In short, Corizon is entitled to summary judgment on Mr. Harper's intentional infliction of emotional distress claim against it.

---

[2] Indeed, citizens who are not in custody are often required to wait for an hour, or more, when seeking medical care.

### 3. Breach of Contract Claim against Corizon

Mr. Harper claims that Corizon breached its contract with the IDOC by failing to properly train its medical personnel and that Mr. Harper is a third party beneficiary to that contract. Dkt. 1 at 4-5, 13-14.

Neither party has provided the Court with a substantive discussion regarding the contract claim. The defendants' simplistic response is that they did not breach any contract because Mr. Harper's medical treatment was appropriate and within the standard of care, and he failed to show that he suffered from any injury resulting from his medical treatment. Dkt. 35 at 19. The unfortunate result is that the Court has not been able to rely on the parties' briefing. Instead, the Court's ruling is based on a reading of the contract itself, dkt. 54-1[3], and independent research.

It is well-settled law that "[t]he parties to a contract are the ones to complain of a breach, and if they are satisfied with the disposition which has been made of it and of all claims under it, a third party has no right to insist that it has been broken." *Harold McComb & Son, Inc. v. JPMorgan Chase Bank, NA*, 892 N.E.2d 1255, 1258 (Ind. Ct. App. 2008) (internal quotation omitted). In Indiana, "only the parties to a contract, those in privity with the parties, and intended third-party beneficiaries under the contract may seek to enforce the contract." *Id.* (citing *Gonzales v. Kil Nam Chun*, 465 N.E.2d 727, 729 (Ind. Ct. App. 1984)).

Mr. Harper is not a party to the contract nor in privity with any of the parties, but he contends that he is the intended third party beneficiary under the contract. The Indiana Supreme Court has explained the circumstances under which a third party to a contract may sue to enforce the contract:

---

[3] The Court notes that neither party initially provided a copy of Corizon's contract with the IDOC, and the Court had to request that the defendants supplement its motion with a copy of the relevant contract. Dkt. 53.

> To be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed. The intent of the contracting parties to bestow rights upon a third party must affirmatively appear from the language of the instrument when properly interpreted and construed.

*Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006) (internal quotation omitted). A third party beneficiary must show the following:

> (1) A clear intent by the actual parties to the contract to benefit the third party;
> (2) A duty imposed on one of the contracting parties in favor of the third party; and
> (3) Performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract.

*Eckman v. Green*, 869 N.E.2d 493, 496 (Ind. Ct. App. 2007) (citing *Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001)). "The intent to benefit the third party is the controlling factor and may be shown by specifically naming the third party or by other evidence." *Id*.

While there is no dispute that the performance of the contract, produced at dkt. 54-1, was to be of benefit to the inmates of IDOC, the intent of the contracting parties to bestow rights upon Mr. Harper does not affirmatively appear from the language of the instrument. *See Cain*, 849 N.E.2d at 514. In Illinois, the contract with the Illinois DOC specifically contains a clause expressly disclaiming the existence of any third party beneficiaries. *See Flournoy v. Ghosh*, No. 07 C 5297, 2010 U.S. Dist. LEXIS 41774, at *5 (N.D. Ill. Apr. 27, 2010); *Johnson v. Shah*, No. 15-cv-344-SMY-RJD, 2018 U.S. Dist. LEXIS 19277, at *25 (S.D. Ill. Feb. 6, 2018). While the same clause is not found in Corizon's Indiana IDOC contract, the only mention in the contract of inmates is in the first line of the agreement that "[t]he Contractor [Corizon] shall provide comprehensive medical services, including dental, medical, mental health and substance abuse, to offenders at IDOC correctional facilities." Dkt. 54-1 at 3. This is not an affirmative statement of

17

any intent to bestow rights upon the inmates at IDOC. Nor is there an affirmative statement in any part of the contract to show an intent to bestow rights on the inmates. In *Ellis v. CCA of Tenn., LLC*, No. 1:08-cv-254-SEB-DML, 2010 U.S. Dist. LEXIS 61837, at *25-27 (S.D. Ind. June 21, 2010), certain nurses asserted that they were third party beneficiaries of a contract between CCA, who was hired to manage the medical needs of inmates in Marion County jails, and the Marion County Sheriff. The Court held that "nothing in the contract specifically indicates that the nurses who were employed by CCA at the Jail were intended to be third party beneficiaries," and therefore summary judgment in favor of CCA was warranted. *Id.* Similarly, because there was no intent by Corizon or IDOC to specifically benefit and confer rights upon the inmates at IDOC's correctional facilities in their contract, Mr. Harper has no legal standing to complain because he is not a third party beneficiary to the contract.

Even if Mr. Harper were a third party beneficiary to the contract and was correct that Corizon breached its contract with the IDOC, Mr. Harper has failed to demonstrate any damages from the alleged breach. *See WESCO Distribution, Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 695 (Ind. Ct. App. 2014) ("The elements of a breach of contract claim are the existence of a contract, the defendant's breach, and damages to the plaintiff.").

Accordingly, Corizon's motion for summary judgment on this claim is granted.

### IV. Conclusion

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 118 S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operates effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional

ordeal of a trial when the outcome is foreordained," and in such cases, summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Mr. Harper has not identified a genuine issue of material fact as to his claims in this case and the defendants are entitled to judgment as a matter of law. Therefore, the defendants' motion for summary judgment, dkt. [34], is **granted.**

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 11/16/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

HOUSTON HARPER
852458
WABASH VALLEY – CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Andrew Scheil
INDIANA ATTORNEY GENERAL
Andrew.Scheil@atg.in.gov

Christine Potter Wolfe
INDIANA ATTORNEY GENERAL
christine.wolfe@atg.in.gov